# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **RICKIE WESTBROOK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:05-cv-57** |
| | ) | |
| **OATESS ARCHEY, SHERIFF OF** | ) | |
| **GRANT COUNTY, in his Official** | ) | |
| **Capacity, BRADLEY MOORE,** | ) | |
| **TERRY NEAL, MATTHEW** | ) | |
| **EDRIS, OFFICER FOY, and** | ) | |
| **NURSE BRANKLE, in their** | ) | |
| **Individual Capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment filed by the

Defendants, Oatess Archey ("Archey"), Bradley Moore ("Moore"), Matthew Edris ("Edris"),

Officer Foy ("Foy"), and Nurse Brankle ("Brankle"), on April 18, 2006, and on a separate

Motion for Summary Judgment filed by the Defendant, Terry Neal ("Neal"), that same day. The

*pro se* Plaintiff, Rickie Westbrook ("Westbrook"), filed a response in opposition to the motion

on July 20, 2006. Neal replied on August 2, 2006, and Archey, Moore, Edris, Foy, and Brankle

replied on August 10, 2006. For the reasons discussed in this Order, both motions for summary

judgment will be granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

Westbrook was arrested and subsequently booked at the Grant County Jail on November 8, 2004.[2] Upon his arrival at the jail, Westbrook claimed to have sustained some injuries to his hand, eye, and throat as a result of a fight prior to his arrest. Westbrook claims he requested medical care from jail officer Edris, but was physically threatened in that Edris would "put [Westbrook] in the hospital if [he] kept yelling for medical help." (Pl.'s Evidence of Genuine Issues & Material Facts to Defs. Mot. for Summ. J. ("Pl.'s Evidence") 2.) Westbrook also claims that Edris promised to put him on that day's sick call list but that this did not occur.

Receiving no medical attention, Westbrook immediately filed a grievance with a request that he be placed on sick call. In response, Brankle told Westbrook that she would send him Ibuprofen until he could be seen by the medical staff. On November 10, Westbrook was examined by Neal, a nurse practitioner who is employed by a private clinic but who provides services to the jail during sick call hours. Neal observed a small scleral hemorrhage in Westbrook's left eye and that his right hand was swollen.[3] Although Westbrook also complained about his neck, Neal noted a full range of motion and no bruises or swelling.

Neal ordered an x-ray of Westbrook's right hand, but because he believed his hand should have been immediately x-rayed, Westbrook filed another grievance on November 11

---

[1] For summary judgment purposes, the facts are recited in the light most favorable to Westbrook, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The Defendants argue that Westbrook failed to properly designate evidence and did not submit sworn evidence according to Federal Rule of Civil Procedure 56. Since Westbrook loses even if we consider his evidence, we need not discuss the Defendants' arguments.

[2] Westbrook claims that he was booked on November 7 but cites no evidence to support this contention.

[3] Neal alleges that she was unable to perform a thorough exam of Westbrook's hand because he "refused to do anything with his right hand." (Def. Terry Neal's Br. in Supp. of Mot. for Summ. J. ("Neal Br.") 2.)

followed by more requests for medical attention on November 12 and 13. Brankle told Westbrook that he would be taken for an x-ray when transport was available, and on November 15 an x-ray revealed a non-displaced fracture at the base of the fourth metacarpal. Apparently, the jail rendered no immediate medical care to Westbrook following this x-ray.

On November 18, Westbrook requested additional medical care, specifically stating that he needed something different for his pain, as the Ibuprofen upset his stomach. In response, Brankle noted that Westbrook was receiving appropriate treatment for his injury and that he could try Tylenol for his pain. Also on that date, Westbrook's hand was wrapped in an ACE bandage.

Westbrook again requested medical care for his hand, specifically for thumb and wrist pain, on November 20, November 24, and November 28, and was examined on November 24. Neal advised Westbrook that it would take four to six weeks for his injury to heal. On December 6, Westbrook filled out yet another grievance form, expressing concern that his hand was not healing properly because it was not in a cast and complaining that his wrist and thumb still hurt. On December 17, Westbrook's hand and thumb were x-rayed, revealing no other fractures and that the hand was healing.

The next day, Westbrook submitted a medical request, asking to talk to someone regarding stress and depression.

Sometime prior to December 19, Westbrook filed a grievance, complaining that Tony Campbell ("Campbell") and his brother were "bad for the block . . . together they try to intimidate people, an[d] Tony makes threats an[d] noise, yells rude things all day." (Pl.'s Evidence Ex. 1.) Jail officer Moore responded to the grievance, stating, "Sorry about your living

3

arrangements you'll have to get along!" (Pl. Evidence Ex. 1.) Westbrook alleges that Campbell

attacked him on December 19, hitting Westbrook "upside the head" and kicking him on his left

side.[4] Jail officer Melissa Shugart ("Shugart") reported the incident to Edris, and subsequently

filed an incident report, recounting that Edris suggested moving Westbrook to another floor "due

to him having [prior] problems with other inmates" in his cell block. (Pl.'s Evidence Ex. 2.)

Shugart also wrote that "both inmates will be placed on the no mix list."[5] (Pl.'s Evidence Ex. 2.)

Following the alleged attack, Westbrook submitted another grievance, requesting medical

care due to alleged injuries on the left side of his head, left ear, and left collar bone. The jail

responded that it was checking into the matter. In the grievance, Westbrook also complained that

officers had disregarded his earlier complaint regarding Campbell, that Campbell should have

been the one moved, and that the new placement was unhealthy because he now had to sleep on

the floor. Edris responded to the grievance, noting that other inmates denied ever seeing

Campbell hit Westbrook, that Shugart had heard Westbrook "cuss and verbally abuse"

Campbell, that they would not penalize Campbell based simply on Westbrook's say-so, and that

one place in the jail was as healthy as another. (Aff. of Cathy Lee ("Lee Aff.") Ex. 7.)

Westbrook filled out another medical request form on January 6, 2005, complaining

again of thumb and wrist pain as well as shoulder pain from Campbell's attack, but indicating

that he did not want to see a doctor if he had to pay for it. As a result, he was placed on sick call.

---

[4] Apparently, the jail's lock down policy was suspended at 6:00 p.m. that day so the inmates could watch a football game, a circumstance that placed Westbrook and Campbell together.

[5] The Grant County Jail has an informal, unwritten policy to separate inmates who have been in fights. The Defendants claim that jail officer Vern Rumpole ("Rumpole") is responsible for composing the so-called "no mix lists" regarding these inmates. The record does not reveal whether Shugart actually requested that Westbrook and Campbell be placed on the list, or if she did, whether Rumpole actually did so. In any event, neither Shugart nor Rumpole are defendants in this action.

4

Despite being placed on sick call, Westbrook filled out yet another request for medical care on January 8, opining that seeing the nurse on sick call was not going to benefit him since he felt the nurses had "limited knowledge." (Lee Aff. Ex. 7.) He also asked for an "extra" mattress. (Lee Aff. Ex. 7.) He filled out yet another request for medical care on January 12, complaining of neck, back, and shoulder pains but also stating that he did not want sick call or medication. Since Westbrook was still awaiting mental health counseling, the jail told Westbrook that he was on the counseling list but that it did not know when the counselors would be there. He again asked for an extra mattress, claiming that "that will be suffic[i]ent." (Lee Aff. Ex. 7.) However, this request was refused. On January 14, Westbrook refused sick call, maintaining that his injuries were not as intense and were beginning to subside.

On January 15, 2005, Campbell was involved in another altercation with an inmate. In her incident report, jail officer Valerie Bruton wrote that she informed Moore of this altercation and that "[i]t was then decided to place inmate Tony Campbell in 2D since he was on a no mix with other inmates and the only place left was 2D." (Pl.'s Evidence Ex. 3.) Despite Westbrook's claim that he informed Moore twice that he and Campbell were not supposed to be on the same block, Campbell was moved into Westbrook's block.[6]

At approximately 10:10 p.m., jail officer Aaron Kellogg ("Kellogg") handed Edris a note from Westbrook, which indicated that Westbrook was not supposed to be in the same cell with Campbell. Edris then advised Kellogg to move Campbell to a different cell block. When Kellogg told Campbell to pack his belongings, inmate Darzell Demont Jones ("Jones")[7] "became very

---

[6] Moore contends that he was unaware that Campbell and Westbrook were not to be mixed and that he had no knowledge of who put the two men together.

[7] Westbrook alleges that Jones is Campbell's cousin, something that both Edris and Moore did not know.

5

upset and belligerent and [made] threatening remarks." (Pl.'s Evidence Ex. 3.) When Edris and

other officers arrived at the cell about a half an hour later to move Campbell,[8] Westbrook

informed them that Jones had hit him. Kellogg noted that Westbrook's face was bruised and

bleeding. Shortly thereafter, jail officers decided that Westbrook required medical attention, and

he was taken to the emergency room at approximately 11:23 p.m.

At the emergency room, a CT scan revealed right orbit fractures with air in the cranial

vault. However, after consulting with a neurosurgeon and an ear nose and throat ("ENT")

specialist, the treating physician concluded that Westbrook did not need to be admitted to the

hospital and that he "just needs close outpatient follow up [with Dr. Gillum, an ENT specialist]

early next week." (Lee Aff. Ex. 2.)

On January 17, Westbrook submitted a request for medical care, indicating that he

wanted his eye examined as soon as possible and wanted his glasses fixed. During Neal's

examination of Westbrook's eye the next day, he complained of a headache and pain in his left

eye. Neal observed that his left eye was swollen and had a scleral hemorrhage. After conferring

with Doctor Ravidra Bharadwaj ("Dr. Bharadwaj"), Neal decided to wait on the recommended

referral to Dr. Gillum because Westbrook was in stable condition.

Because Westbrook was taking narcotics for his pain, he was placed in a single-person

cell. As a result, Westbrook submitted a medical request form on January 19 complaining that

the cell was freezing and that the "hole" was giving him headaches and exacerbating his stress

---

[8] Contrary to his proffered exhibit, Westbrook claims that it took Edris over three hours to move Campbell, during which time both Campbell and Jones threatened him. He also contends that officers heard these threats, but he does not indicate which officers heard the threats or the nature of the threats.

and depression.[9] He also inquired about counseling and was told that he was on the counseling list. In addition, he asked to see an ENT but was told that the nurse practitioner consulted with a doctor about his injury and that it simply takes time for a fracture to heal.

Westbrook submitted a similar request for an eye examination on January 20 and was subsequently evaluated by Brankle the next day. Brankle observed that Westbrook's eye was very bloodshot and gave him Visine eye drops and an eyepatch. She also gave Westbrook an extra blanket because he complained of being cold. Finally, she told Westbrook that she would have the nose piece repaired on his glasses, that she would monitor him over the next couple of days, and that he should come to the next scheduled sick call.

Neal examined Westbrook on February 8 and wrote a referral for an ophthalmologist or an optometrist. On February 10, 15, and 23, Westbrook submitted more medical requests, inquiring when he was going to see a doctor for his eye and indicating that sick call was not solving his problems. Brankle's response was that an appointment had been scheduled.

On February 20, Westbrook indicated that he was "starting to feel really depressed an[d] very emotionally stress[ed] at this facility," requesting to "see someone." (Lee Aff. Ex. 7.) He was placed on sick call as a result. Two days later, he reiterated his request for mental health services and also indicated that he did not want to be placed on sick call. Brankle responded that he needed to be seen at sick call for an evaluation and that she had requested Vickie Frost or a member of her staff to see him. Apparently, he was eventually evaluated by someone, as he thanked the jail staff on February 23 for "sending the lady to talk to [him] . . . ." (Lee Aff. Ex. 7.)

_____

[9] Westbrook alleges that someone promised him a spot in the medical block upon the next available opening, but it was given to another inmate. Westbrook also complains generally about jail conditions, specifically claiming that the jail was overcrowded, with resulting violence.

On February 28, he inquired about when he could talk to a counselor, and the jail responded "when we have someone available."[10] (Lee Aff. Ex. 7.)

On March 2, Westbrook was taken to Doctor Todd Fettig ("Dr. Fettig"), an optometrist, who reported that Westbrook's eye health was good and that no problems were noted. He also wrote an order for new glasses. Despite this visit, Westbrook submitted another medical request on March 6, complaining of visual problems. In response, the jail reminded him that the doctor had noted no problems and that his eye would get better with time.

Westbrook refused to attend sick call four times in March and April of 2005, specifically stating on his March 9 medical request that "I don't need sick call." (Lee. Aff. Ex. 7.)

After receiving his new glasses, Westbrook requested that they be tinted like his old prescription glasses. Brankle responded that unless he was willing to pay for the tint, his glasses would remain the way they were. Undeterred, Westbrook again requested on March 10, 13, and 24 that his glasses be tinted. Throughout this same period, Westbrook complained of eye problems and headaches and asked to be examined by Dr. Gillum.[11] Brankle responded that Westbrook could not be sent out for an exam and that the nurse practitioner would first have to check him.

---

[10] Westbrook submitted another request for counseling on March 7, and Brankle responded that she "already answered [his request] about counseling–trying to find someone to come to the jail is difficult." (Lee Aff. Ex. 7.)

Although the record is unclear as to when Westbrook saw a mental health counselor, Westbrook claims that he had a total of two visits with two separate professionals, one of whom was not a psychiatrist and the other being an intern.

[11] On March 15, Westbrook refused sick call. In a subsequent medical request, Westbrook complained that he was called to sick call when he did not ask for it and that he felt he was being set up because Campbell was also taken to sick call on March 15.

Because Westbrook continued to complain regarding his vision and pain, Neal referred him back to Dr. Fettig on April 6.[12] Dr. Fettig reported residual inflammation in Westbrook's left eye secondary to injury and gave him eye drops. When Westbrook eventually asked for additional eye drops, Brankle called Dr. Fettig, who told her that Westbrook did not need more eye drops.

On April 28, Neal saw Westbrook, who complained of headaches and pain in his left eye. He rated his pain as a seven out of ten, but he also indicated that the pain responded to Ibuprofen. Westbrook also was refusing to wear his glasses because they were not tinted. Upon examining Westbrook's eye, Neal observed no problems. She opined that continued treatment was not necessary and that Westbrook could take aspirin for his headaches.

Although Westbrook continued to complain of left eye pain and headaches, Neal could not find any evidence of residual trauma on May 3. In light of Westbrook's continued complaints, however, Neal recommended a repeat CAT scan.

After Westbrook continued to file requests for medical care, Dr. Bharadwaj examined him on May 13. According to Dr. Bharadwaj, Westbrook's left eye was "mildly sunken due to previous injury," his cornea and retina were clear, there was no hemorrhage, and his optic disc was normal. (Lee Aff. Ex. 5.) Dr. Bharadwaj advised Westbrook to get new glasses.[13]

---

[12] Officer Foy transported Westbrook to this visit. Westbrook alleges that Foy was "unpleasant" towards him at the doctor's office. (Pl.'s Evidence 7.) Specifically, Westbrook claims that Foy "would stand over me, to make me look bad in the peoples [sic] eyes, as though I was a harden [sic] criminal, or would escape in shackles and cuffs." (Pl.'s Evidence 7.) He also claims that Foy would make fun of him in front of Dr. Fettig's nurse, stating that Westbrook "was whining like a baby." (Pl.'s Evidence 7.) Finally, Westbrook asserts that Foy attempted to answer Dr. Fettig's questions, inaccurately telling the doctor how Westbrook was healing and about Westbrook's fracture.

[13] In response to this recommendation, Neal entered a note on Westbrook's chart indicating that Westbrook had already received new glasses in March 2005.

Throughout June, Westbrook continued submitting medical requests regarding his eye pain and headaches; accordingly, Neal saw him on June 28. Westbrook indicated that Tylenol was not effective for his headaches, which he had three to four times daily and which sometimes last all day. He also reported that the headaches were usually behind his left eye and traveled behind his neck. Neal's examination of Westbrook's eye was normal, and she advised him to take extra strength Tylenol and Flexeril.

On July 6, Westbrook submitted another medical request in which he indicted that "I didn't ask for sick call if they were going to charge me," and he again complained of headaches and eye pain. (Lee Aff. Ex. 7.) Brankle responded that "[a]lmost every single day you send medical requests to the med room. The only way to discuss them w[ith] you is [at] sick call." (Lee Aff. Ex. 7.)

On July 8, Westbrook asked to see "Ms. Elizabeth (the new intern)" for his stress and depression. (Lee Aff. Ex. 7.) Brankle put him on the list to see her. He renewed his request to see "the mental health lady" on July 25 and August 1 but was informed that she was no longer available. (Lee Aff. Ex. 7.)

On August 16, Neal again ordered a CAT scan due to Westbrook's continued complaints. The CAT scan showed that the fracture had healed and that there were no long term concerns.

Westbrook filed a complaint on February 14, 2005, suing the Defendants under 42 U.S.C. § 1983. Specifically, Westbrook claims that the Defendants were deliberately indifferent to his serious medical needs following his arrest and again after both the Campbell attack and the Jones attack. He also alleges that Moore and Edris were deliberately indifferent because they failed to protect him against the attacks by Campbell and Jones. Finally, Westbrook advances claims

against Sheriff Archey in his official capacity.

## II. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."[14] *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## III. DISCUSSION

A. *Westbrook's Individual Capacity Claims Against Edris, Moore, Foy, Brankle, and Neal Fail*

1. <u>General Principles</u>

In order to state a claim under § 1983, a plaintiff must show that the defendants (1) acted

---

[14] Throughout Westbrook's "Evidence of Genuine Issues and Material Facts to Defendants Motion for Summary Judgment," he asks the court to render credibility determinations, conclusorily asserting that the Defendants are advancing false statements, lies, and deliberate coverups. In short, credibility determinations are inappropriate at the summary judgment stage. *See Abdullahi v. City of Madison*, 423, F.3d 763, 773 (7th Cir. 2005).

under color of state law, and (2) deprived him of some right under the Constitution or the laws of the United States.[15] *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931 (1982); *Ineco v. City of Chicago*, 286 F.3d 994, 997-98 (7th Cir. 2002); *Harbours Pointe of Nashotah, LLC v. Village of Nashotah*, 278 F.3d 701, 704 (7th Cir. 2002). Westbrook's claims, brought under the Fourteenth Amendment of the United States Constitution,[16] allege that the individual Defendants acted with deliberate indifference when they either ignored his serious medical needs or failed to protect him from the attacks of other inmates.

A defendant cannot be liable in an individual capacity under § 1983 unless he was personally involved in causing the alleged constitutional deprivation. *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003) (citing *Zentmyer v. Kendall County*, 220 F.3d 805, 811 (7th Cir. 2000); *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000); *Davis v. Zirkelbach*, 149 F.3d 614, 619 (7th Cir. 1998)). Although "direct participation" is not required, the individual defendant must have "acquiesced in some demonstrable way in the alleged constitutional violation." *Id.* In other words, "[a] causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Galdikas v. Fagan*, 342 F.3d 684, 694 (7th Cir. 2003) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)), *abrogated*

---

[15] It is undisputed that all Defendants acted under color of state law.

[16] Although Westbrook also advances his claims under the Eighth Amendment, it is inapplicable here because Westbrook was a pretrial detainee. *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005). Accordingly, only the Fourteenth Amendment applies to Westbrook's claims. *Id.* The Seventh Circuit has recognized, however, that there is "little practical difference between the two standards" and that "the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment protection available to a convicted prisoner . . . ." *Id.* Thus, Westbrook's Fourteenth Amendment claims will be analyzed under Eighth Amendment standards. *Id.*

*on other grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004).

2. The Alleged Delays in Medical Treatment Following Westbrook's Arrest Do Not Give Rise to a Claim of Deliberate Indifference

Westbrook alleges that Edris was deliberately indifferent to his serious medical need following his arrest because Edris denied him medical care for his broken hand.[17] Specifically, Westbrook claims that Edris threatened him in response to his request for medical care and failed to put him on the sick call list. Westbrook also contends that Neal and Brankle were deliberately indifferent for delaying medical treatment because it took two days before his hand was examined and then an additional five days before it was x-rayed.

To establish that a defendant was deliberately indifferent to a serious medical need, the detainee must show (1) that "the harm to [him] was objectively serious," and (2) that "the official was deliberately indifferent to [his] health or safety." *Zentmyer*, 220 F.3d at 810 (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Payne v. Churchich*, 161 F.3d 1030, 1041 (7th Cir. 1998)). An objectively serious harm is a serious injury or medical need that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).

For a defendant to be deliberately indifferent under prong two, he must be "aware of a substantial risk of serious injury to the detainee but nevertheless fail[] to take appropriate steps to protect him from a known danger." *Payne*, 161 F.3d at 1041. While this is more than a mere

---

[17] The Defendants do not dispute that a broken hand is a serious medical need. *See Murphy v. Walker*, 51 F.3d 714, 720 (7th Cir. 1995).

negligence or gross negligence standard, a plaintiff need not show "that a [jail] official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842; *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002); *Estate of Novack*, 226 F.3d at 528; *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991).

"[I]ntentionally denying or delaying access to medical care" can result in deliberate indifference; however, "[t]he mere fact of delay in providing medical care is not per se evidence of deliberate indifference." *Senisais v. Fitzgerald*, 940 F. Supp. 196, 199 (N.D. Ill. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 97 (1976); *Murphy*, 51 F.3d at 717). In order for a delay in medical treatment to rise to a level of deliberate indifference, an inmate "must place *verifying medical evidence* in the record to establish the detrimental effect of delay . . ." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (emphasis in original), *see also Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002). Here, Westbrook's claims against all three Defendants collapse because he points to no medical evidence, or in fact any evidence, demonstrating that the alleged delays (i.e., Edris in failing to put him on that day's sick call list; Neal and Brankle in taking days to obtain an x-ray) were a detrimental to him.[18]

Furthermore, Westbrook's claims against Neal and Brankle fail because he presents no evidence that the delays between his initial request for medical attention, and the resulting examination and x-ray, were within their control. *See Walker*, 293 F.3d at 1038 (finding that a doctor was not liable for a delay between a prisoner's initial visit with the doctor and a visit to a

_____

[18] Although Westbrook alleges rude conduct by Edris, that alone does not violate the constitution. *Langston*, 100 F.3d at 1240.

specialist because the prisoner had "presented no evidence that these delays were even within [the doctor's] control"); *Murphy*, 51 F.3d at 718 (noting that a delay in treatment was not a result of "knowing disregard of an excessive risk to [plaintiff's] health or well-being" but was instead a result of having to get permission to take the plaintiff to a hospital). In fact, the evidence supports a similar proposition here: Brankle and Neal seemingly had little control over when Westbrook would be examined and x-rayed. Indeed, Brankle responded to Westbrook's initial medical request, not with indifference, but by sending him Ibuprofen *until he could be seen* by the medical staff, and responding to Westbrook's request for an immediate x-ray by telling him that he would be taken for one when transport was available.

In short, Westbrook fails to create a genuine issue of material fact that Brankle or Neal acted with deliberate indifference in response to his broken hand. To the contrary, Brankle responded promptly to his requests for medical care, sending him Ibuprofen for his pain until he could be examined. Furthermore, Neal ordered an x-ray after observing that Westbrook's hand was swollen. Morever, after complaining that he was still in pain and that his hand was not healing properly, another x-ray was taken, revealing that his hand was in fact healing. Brankle and Neal's course of action was reasonable as a matter of law and certainly not deliberately indifferent.

3. The Failure to Prevent Campbell's Attack on Westbrook Does Not Give Rise to a Claim of Deliberate Indifference

Westbrook claims that Moore and Edris should be liable for failing to protect him against being attacked by Campbell. To establish claim for failure to protect, a plaintiff must

demonstrate "1) that he suffered an objectively 'sufficiently serious' injury; and 2) that he was 'incarcerated under conditions posing a substantial risk of serious harm.'" *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006) (quoting *Farmer*, 511 U.S. at 834). A prison official is liable only when "he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* (quoting *Farmer*, 511 U.S. at 847).

The Seventh Circuit has interpreted "substantial risk" in the context of inmate attacks as "risks so great that they are almost certain to materialize if nothing is done." *Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005); *see also Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006) ("[I]n order to infer callous indifference when an official fails to protect a prisoner from the risk of attack, there must be a 'strong likelihood' rather than a 'mere possibility' that violence will occur."). In that regard, the Seventh Circuit explained that "[w]hen our cases speak of a 'substantial risk' . . . they also have in mind risks attributable to detainees with known 'propensities' of violence toward a particular individual or class of individuals; to 'highly probable' attacks; and to particular detainees who pose a 'heightened risk of assault to the plaintiff.'" *Brown*, 398 F.3d at 911.

Here, Westbrook contends that Edris's suggestion in the following incident report that Westbrook be moved to another floor because of prior problems with other inmates is evidence that Edris was aware of the threat that Campbell posed. Westbrook also claims that his complaint about Campbell and his brother was enough to put Moore on notice that there was a substantial risk of serious harm.

Westbrook's claim against Edris is easily disposed of. Even if Edris was aware that Westbrook had problems with other inmates prior to the attack, there is no evidence that Edris

16

was aware that Westbrook faced a substantial risk of being attacked by Campbell. Specifically, there is no reference to Campbell in Edris's statement, nor any mention concerning Campbell's propensity towards violence. *See id.* Additionally, there is no indication, and certainly no reasonable inference, that Westbrook's prior "problems" with other inmates were liable to escalate to violence. *See id.*

In addition, Westbrook's grievance was not enough to put Moore on notice that he faced a substantial risk of attack by Campbell. Indeed, the grievance does nothing more than indicate that Campbell was intimidating others on the block, not Westbrook; in short, there was nothing in the grievance to indicate to Moore that there was a "strong likelihood" of an attack on Westbrook by Campbell. *See Pinkston*, 440 F.3d at 889.

4. Westbrook Fails to Establish That He Was Treated with Deliberate Indifference Following the Campbell Attack

Westbrook claims that he was treated with deliberate indifference because he did not receive any medical attention following the December 19 attack. This claim fails at the outset because Westbrook does not establish that any of the individual Defendants knew of his serious medical need following the December 19 attack.[19] *See Payne*, 161 F.3d at 1041.

Moreover, Westbrook fails to create a genuine issue that the alleged injuries he received as a result of the attack amounted to a serious medical need. *See Chapman v. Keltner*, 241 F.3d at 845; *Gutierrez*, 111 F.3d at 1373. Although Westbrook claims that he experienced some left side pain following the attack, there is no indication that it amounted to a serious medical need. Indeed, Westbrook's own medical requests cut against the seriousness of his claim, as he stated

_____

[19] Indeed, Brankle was apparently on vacation during this time.

that he did not want sick call or medication, that he did not want to see a doctor if he had to pay

for it, that an extra mattress would be sufficient to ease his pain, and that he refused sick call

because his pain had subsided. *See Williams v. Shuman*, No. 96 C 0916, 1999 WL 350633, at *9

(N.D. Ill. May 20, 1999) (finding that plaintiff's refusal to cooperate with treatment belied his

assertion that he had a serious medical need).

Finally, Westbrook fails to demonstrate that the Defendants were deliberately indifferent

toward his alleged medical needs. In his medical request forms, he gave only one option as

acceptable to him–an extra mattress. However, the Constitution does not guarantee a prisoner's

choice of treatment, nor does it ensure a particular level of comfort in the face of physical

maladies. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) (opining that the plaintiff was "not

entitled to demand specific care"); *Brownlow v. Chavez*, 871 F. Supp. 1061, 1064 (S.D. Ind.

1994). Accordingly, the Defendants were not deliberately indifferent for failing to provide

Westbrook with the only course of treatment he deemed acceptable.

5. The Failure to Prevent Jones's Attack on Westbrook Does Not Give Rise to a Claim of
Deliberate Indifference

Westbrook contends that Edris and Moore should be liable for failing to protect him

against the attack by Jones. He argues that Edris was deliberately indifferent because he

allegedly failed to place Westbrook's and Campbell's names on the no-mix list and waited three

hours before moving Campbell out of Westbrook's cell. Furthermore, Westbrook claims that

Moore was deliberately indifferent because he was allegedly responsible for placing Campbell in

his cell block on January 15, this after Westbrook purportedly twice told Moore that he was not

to be mixed with Campbell.

18

Of course, even if we accept Westbrook's allegations as true, his arguments miss an important point–he was attacked by Jones, not Campbell. Although Westbrook contends that "officers" heard Jones threaten him after Campbell was moved into the cell, he does not specify who these officers were, whether they relayed the threats to Moore or Edris, or the nature of the threats.[20] Accordingly, Westbrook fails to show, or even raise an inference, that Moore and Edris were aware that there was any likelihood that he would be attacked by Jones simply because Campbell was placed on, or later removed from, his block. *See Brown*, 398 F.3d at 911.

6. Westbrook Fails to Establish That He Was Treated with Deliberate Indifference Following the Jones Attack

Westbrook argues that the Defendants were deliberately indifferent to his serious medical needs following the Jones attack because they failed to take him to the recommended follow-up appointment with Dr. Gillum.[21] The Constitution, however, does not require "unqualified access to health care"; rather it requires only "adequate medical care." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Here, the record establishes that Westbrook received adequate follow-up care; three days after the attack, Neal examined Westbrook, and after consulting with Dr. Bhardwaj, decided that the follow up with Dr. Gillum was not necessary because Westbrook was in stable condition. Westbrook makes no attempt to demonstrate that this decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to

_____

[20] Kellogg's incident report indicates that Jones "became very upset and belligerent and [made] threatening remarks" after Campbell was told to pack his belongings; however, the report does not indicate whether Edris or Moore were informed of these threats or whether these threats were directed towards Westbrook. (Pl.'s Evidence Ex. 3.)

[21] Westbrook's claim again fails at the outset because he fails to specify which of the individual Defendants were aware of the referral to Dr. Gillum. The record, however, at least suggests that Neal was aware of the referral to Dr. Gillum; therefore, the court will assume that Westbrook is advancing this claim against Neal.

demonstrate that the person responsible actually did not base the decision on such a judgment . . . ." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998). Instead, Westbrook simply rests his deliberate indifference argument on the emergency room physician's recommendation that he have a follow up with Dr. Gillum. This argument demonstrates nothing more than a possible disagreement between medical professionals regarding Westbrook's treatment plan, which is far short of making out a claim for deliberate indifference. *See id.* at 990 ("While such a dispute [regarding a plaintiff's treatment plan] might state a negligence cause of action, it cannot make out a substantive due process claim.").

Furthermore, in viewing the totality of care Westbrook received after the attack, *see Walkers v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000), Neal's failure to order follow-up care with Dr. Gillum does not create a genuine issue of material fact regarding deliberate indifference. After all, Westbrook was taken to the emergency room immediately following the attack, where he received a CAT scan. Following this initial treatment, Neal followed up with Westbrook, and although her exams revealed nothing abnormal, she ordered two appointments with Dr. Fettig and another CAT scan based on Westbrook's continued complaints. These examinations also yielded normal findings. Throughout this course of treatment, Westbrook received pain medications, an eye patch, and new glasses.

Westbrook also contends that the Defendants exhibited deliberate indifference for refusing to tint his glasses. The record, however, reveals that Nurse Brankle informed Westbrook that he could have his glasses tinted if he paid for it. It is not a constitutional violation to require Westbrook to pay to have his glasses tinted. *See Freshwater v. Brankle*, No. 1:04-CV-2-TS, 2005 WL 3159151, at *7 (N.D. Ind. Nov. 28, 2005) ("It certainly did not evidence deliberate

20

indifference when the Defendant told the Plaintiff the jail did not provide prescription glasses and informed him that glasses were available for him to buy from the medical commissary.").[22]

Finally, Westbrook also asserts that Foy's behavior at Dr. Fettig's office amounts to deliberate indifference because it caused him stress and emotional pain. Although Foy's alleged verbal harassment might have been unprofessional, it does not constitute a constitutional violation under Section 1983. *Pride v. Holden*, 1 F.3d 1244 (7th Cir. 1993) (citing *Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir.1987); *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987); *Martin v. Sargent*, 780 F.2d 1334, 1338-39 (8th Cir. 1985)); *Robinson v. Village of Matteson*, No. 97 C 4758, 1999 WL 965231, at *4 (N.D. Ill. Sept. 30, 1999). Moreover, although Westbrook indicates that Foy inaccurately answered questions that Dr. Fettig was posing to Westbrook, there is no allegation that Dr. Fettig based his examination on these responses or that Foy thought that he would. Indeed, despite these purported inaccurate statements, Westbrook admits that he has no complaints regarding his treatment by Dr. Fettig.

7. Westbrook Fails to Establish That He Was Treated with Deliberate Indifference Regarding His Mental Health

In his final individual capacity claim, Westbrook asserts that he was treated with deliberate indifference in regard to his mental health. Specifically, he contends that despite his

---

[22] Furthermore, there is little evidence to indicate that Westbrook's medical need was "objectively serious." *Id.* at *6. Westbrook's medical requests only indicate his eyes have problems adjusting to light and that light irritates his eyes; they do not indicate that Westbrook suffered harm because his glasses were not tinted. *Id.* (finding plaintiff's condition was not "objectively serious" after plaintiff alleged he needed glasses to "alleviate headaches, blurred vision, and watery and burning eyes when reading").

numerous requests for counseling, it took long periods of time for him to see someone and that

he only had two mental health evaluations.[23] These claims fail because he makes no showing that

the delays in being evaluated or the fact that he had only two evaluations were within the control

of any Defendants. *See Walker*, 293 F.3d at 1038; *Murphy*, 51 F.3d at 718. Indeed, in response to

his medical requests, the jail continually informed him that he was on the list and reminded him

that he would be able to have an evaluation when someone was available.

In addition, Westbrook complains because neither of the mental health professionals he

saw were psychiatrists. However, as noted above, Westbrook is not entitled to demand specific

care; all that is required is that he receive adequate care. *Johnson*, 433 F.3d at 1013; *Forbes*, 112

F.3d at 267; *Brownlow*, 871 F. Supp. at 1064.

B. *Westbrook's Claims Against Archey Fail*

Westbrook makes numerous factual allegations against Archey, although it is unclear

what legal theories he is advancing. In that regard, Westbrook seemingly asserts an individual

capacity claim against Archey for an alleged failure to properly supervise the jail staff, resulting

in undetected violations of jail policy. Archey, however, "cannot be liable for any constitutional

violations committed by his officers simply by virtue of his supervisory role" and also cannot be

liable simply for negligently failing to detect and prevent jail officers' alleged misconduct.

*Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003). Instead, Archey can only be

liable if he knew of the conduct and facilitated it, approved it, condoned it, or turned a blind eye

for fear of what he might see. *Id.* Westbrook advances no such evidence against Archey in that

---

[23] Once again, Westbrook's claim fails at the outset because he does not assert that any of the individual Defendants had knowledge of his mental health needs. *Payne*, 161 F.3d at 1041.

regard, and therefore this purported claim fails as a matter of law.

Westbrook also believes that Archey should be liable in his official capacity, but that claim fails because he does not show that the alleged deprivation of his constitutional rights was affirmatively linked to a policy or custom.[24] *See Graham,* 473 U.S. at 167; *Hill,* 924 F.2d at 1372. To the contrary, Westbrook acknowledges that a number of policies were in place to protect inmates from potential violence; for example, the jail had a 6:00 p.m lock down policy, an informal policy of not mixing inmates who had been involved in fights, an inmate classification system, and protective isolation for inmates with disciplinary problems.

Furthermore, Westbrook claims that Archey should be liable in his official capacity for a failure to train, arguing conclusorily that "[b]ecause [Archey] states he had no notice of problems means he had a poorly trained staff." (Pl.'s Evidence 13.) This allegation utterly fails to raise a genuine issue of material fact, as Westbrook does not offer any evidence linking the alleged "problems" at the jail to any sort of inadequate training. In addition, the claim also fails because the claims against the individual officers do not survive summary judgment, a necessary prerequisite for any failure to train claim. *Thurman v. Village of Homewood,* 446 F.3d 682, 686 (7th Cir. 2006).

Finally, Westbrook advances a number of claims against Archey related to the conditions

---

[24] A claim against a government official in his official capacity is in reality a claim against the governmental entity. *Kentucky v. Graham,* 473 U.S. 159, 167 (1985). Because *respondeat superior* is not a recognized theory under § 1983, *Monell v. Dep't of Social Servs. of City of New York,* 436 U.S. 658, 689 (1978), in order to prevail on an official capacity claim the plaintiff must show (1) the alleged deprivation of a constitutional right (2) that is affirmatively linked to the governmental entity's policy or custom. *Graham,* 473 U.S. at 166; *Hill v. Shelander,* 924 F.2d 1370, 1372 (7th Cir. 1991). A "policy or custom" may be established by showing: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Butera v. Cottey,* 285 F.3d 601, 605 (7th Cir. 2002).

of the Grant County Jail. Specifically, he alleges that the holding cell he was placed in after the January attack was cold and filthy and that he had to sleep on a mattress on the floor. He also contends that the jail was overcrowded, leading to violence among the inmates. These claims, however, fail to raise a genuine issue that the conditions at the jail, either alone or in combination, constituted a violation of Westbrook's constitutional rights.

Jail conditions may be "harsh and uncomfortable" without violating the Constitution. *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). Detainees are, however, entitled to "the minimal civilized measure of life's necessities," which includes protection from the cold. *Id.* To assess whether a cold cell constitutes a constitutional violation, courts consider "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Eady v. Sawyer*, No. Civ. 02-1225-MJR, 2005 WL 2206249, at *6 (S.D. Ill. Sept. 12, 2005) (quoting *Dixon*, 114 F.3d at 644); *see also Clark v. Spey*, No. 01 C 9669, 2002 WL 31133198, at *2 (N.D. Ill. Sept. 26, 2002) (finding that plaintiff's allegations that he was "placed in a cold and unlighted cell where he was deprived of warm clothing, a functioning toilet, toilet paper, a mattress, sheets, and a blanket for a period of several hours" were insufficient to state a claim for constitutional deprivation).

Here, Westbrook's exposure to the cold was seemingly of a short duration, as he first complained on January 19 and was promptly given a blanket the following day. *See Freeman v. Berge*, No. 03-C-0021-C, 2003 WL 23272395, at *14 (W.D. Wis. Dec. 17, 2003) (noting that short-term exposure to extreme temperatures does not violate the Constitution). The record reveals no further complaints by Westbrook regarding the cold, and he furnishes no evidence

about its severity.

In addition, the "other uncomfortable" conditions he claims to have endured are either unsupported or are clearly not constitutional violations. For example, although Westbrook contends that his cell was filthy, he provides no specifics or probative evidence. And while Westbrook complains that he had to sleep on a mattress on the floor, it is well-established that the failure to provide a detainee with a bed is not a constitutional deprivation. *See Woodson v. Herman*, No. 1:05-CV-253-TS, 2005 WL 1958652, at *2 (N.D. Ind. Aug. 11, 2005) (collecting cases) (quoting *Thomas v. Squadrito*, 98-CV-240, slip op. p. 12 (opining that the bunk that the plaintiff "aspired" to was "nothing more than a suspended steel platform, and this can hardly be characterized as any great improvement over a concrete floor")). Therefore, based on the record, Westbrook fails to demonstrate that the conditions in the holding cell violated his constitutional rights.

Westbrook's allegations regarding jail overcrowding likewise fail to create a genuine issue of material of fact. Westbrook baldly asserts that the jail was overcrowded yet provides no evidence regarding the jail's capacity, the number of inmates in the jail at the time he was incarcerated there, or the incidence of violence supposedly spawned by such factors. *See Malone v. Becher*, No. NA 01-101-C H/H, 2003 WL 22080737, at *10 (S.D. Ind. Aug. 29, 2003) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981)) ("Overcrowding itself, however, is not [a constitutional] violation unless it leads 'to deprivations of essential food, medical care, or sanitation . . . [or] increase[s] violence among inmates or create[s] other conditions intolerable for prison confinement.'"). Accordingly, Westbrook fails to show that the jail was indeed overcrowded during his stay, and the claim fails for a lack of evidence.

D. *Qualified Immunity*

Because there is no genuine dispute as to whether the Defendants violated Westbrook's

Fourteenth Amendment rights, the court need not address whether qualified immunity applies.

*See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

## IV. CONCLUSION

Based on the foregoing, both motions for summary judgment (Docket ## 153, 156) are

GRANTED. The Clerk is directed to enter a judgment in favor of Archey, Moore, Neal, Edris,

Foy, and Brankle and against Westbrook.

SO ORDERED

Entered: November 2, 2006

<u>S/ William C. Lee</u>
William C. Lee, Judge
United States District Court
Northern District of Indiana